**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GUY J. SCHNEIDER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-2732 |
| | § | |
| HARRIS COUNTY SHERIFF'S OFFICE, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a state inmate proceeding *pro se* and *in forma pauperis*, filed this section 1983 complaint against the Harris County Sheriff's Department[1] for use of excessive force. Defendant filed a motion for summary judgment (Docket Entry No. 17), to which plaintiff filed a counter motion. (Docket Entry No. 25.)

Based on a careful consideration of the motions, the probative summary judgment evidence, the record, and the applicable law, the Court GRANTS defendant's motion for summary judgment, DENIES plaintiff's motion for summary judgment, and DISMISSES this case for the reasons that follow.

*Factual Background and Claims*

Plaintiff asserts that, on August 23, 2005, he was arrested by Harris County Sheriff's Office law enforcement officers on suspicion of burglary of a habitation. During the arrest,

---

[1]Defendant states that its correct agency name is the Harris County Sheriff's Office. (Docket Entry No. 17, p. 9.)

plaintiff was bitten by a police dog and struck on the mouth with a flashlight, resulting in the loss or breakage of several teeth. On September 28, 2005, he pleaded guilty to the underlying offense of burglary of a habitation. He remained in custody of the Harris County Jail from the date of his arrest until November 11, 2005, when he was transferred to the Texas Department of Criminal Justice. Plaintiff claims that county officers used excessive force in his arrest and were deliberately indifferent to his serious dental needs regarding his broken teeth. He seeks compensatory damages in an amount of $20,000.00.

Plaintiff's claims against defendant are claims against Harris County, Texas, as the Harris County Sheriff's Office is not a separate legal entity. Because plaintiff does not allege that Sheriff Tommy Thomas was personally on the scene or directly involved in the incidents made the basis of his lawsuit, Harris County stands as the legal entity named and served as the defendant in this lawsuit.

### *Summary Judgment Standards*

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the district court must determine whether the pleadings and records indicate if there is a genuine issue regarding any material fact and whether the moving party is entitled

to judgment as a matter of law. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue. *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). To meet this burden, the movant must present evidence that shows that the non-movant cannot carry its burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant may accomplish this by showing that the non-moving party has presented no evidence in support of his claim. *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Once the movant has met this burden, the burden shifts to the non-movant to present specific facts showing that there is a genuine issue for trial; otherwise, summary judgment will be entered in favor of the movant. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

*Analysis*

*Claims for Use of Excessive Force*

Plaintiff claims that defendant's law enforcement officers used excessive force during his arrest. Defendant contends that only force reasonable and necessary under the circumstances of the arrest was used.

Claims that law enforcement officers used excessive force in effecting arrests are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). A plaintiff must present evidence of (1) some injury, (2)

which resulted directly from the use of force that was clearly excessive to the need, and that (3) the force used was objectively unreasonable. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). A court must carefully examine the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. The "calculus of reasonableness" must allow for the reality that "police officers are often forced to make split-second judgments" about a particular situation "in circumstances that are tense, uncertain, and rapidly evolving." *Id*. at 396-97. This Court must determine the reasonableness of the officers' use of force in light of the facts and circumstances confronting them at the time they acted, without regard to their underlying intent or motivation. *Id*. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). The question must be viewed from the perspective of a reasonable officer on the scene, and not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The question for this Court to ask is whether no reasonable officer could have believed that the level of force used by the officer was necessary under the circumstances of the case. *Id.*

In presenting their respective positions in this instance, the parties rely on the same set of controlling documents: the underlying offense report, the Harris County Sheriff's

Office Department Manual, and the affidavits of Deputy William M. Thomas, Paulette Mitchell, plaintiff's father, and Sergeant Mitchell Hatcher.

In his affidavit, Harris County Sheriff's Deputy William M. Thomas testified, in relevant part, as follows:

> On August 23, 2005, I was a Harris County Sheriff's Deputy, assigned to the K-9 division. At about 2:10 p.m., my brother and I were moving some supplies we use in training our police dogs. My brother, David A. Thomas, is a Houston Police Officer assigned to their K-9 division. We were in my patrol vehicle when we heard a radio dispatch requesting a K-9 Officer to assist in finding an escaped burglary suspect. David had his partner, Rudy, with us so we decided to check by to assist.
>
> We met the Deputies on the scene at the last known location of the suspect, at 14706 Mystic Bend. The trail led from the back yard, across a field, to the back yard of a residence at 13602 Jarvis. We went around the fence to the side of the house and entered the back yard through the gate. We saw a tool shed in the back yard. Rudy the canine tracked straight to the tool shed. We approached the tool shed and Rudy alerted at the front door of the small building.
>
> The shed door was not locked. We opened the door. At first we did not see the suspect. The light was very dim inside and our eyes had not adjusted to the darkness. I carry a small flashlight (weighing 10 ounces, and approximately 7 inches long) called a stinger made by Streamlight for these type occasions. I shined my flashlight inside and we spotted the suspect attempting to hide in the upper roof area in the back of the shed.
>
> I now know the suspect in the tool shed to be Guy Schneider, the plaintiff in this lawsuit. I will refer to him as either Mr. Schneider or 'the suspect' during the rest of this affidavit. We ordered Mr. Schneider to get down and come out of the building to us. Mr. Schneider jumped down, but he refused to come out. He appeared to be enraged, shouting, "Shoot me. Just shoot me!" In a clear, loud voice we ordered Mr. Schneider to lay face down on the floor of the shed. Mr. Schneider refused to comply with our lawful orders. In my offense report, written shortly after the incident, I describe Mr. Schneider as being in a 'crazed suicidal state.' I agree with that characterization today. Mr. Schneider was an

unsearched felony suspect. And, there were a number of tools in the shed within Mr. Schneider's reach. Several of the tools could easily be used as a deadly weapon.

David told Mr. Schneider that if he did not comply with our orders, he would release Rudy. After numerous attempts to get Mr. Schneider to comply, David released Rudy. Rudy charged into the shed and bit Mr. Schneider on his right thigh and began to pull him toward us. Mr. Schneider refused to submit and began attacking Rudy by hitting the police dog on the head and choking him. David jumped into the shed to save his dog. I was right behind him. David tried to pull Rudy off, but Mr. Schneider would not release his choke hold. Mr. Schneider was now attacking anyone he could strike. I attempted a collar bone strike with my small Stinger flashlight, but Rudy jerked as I was delivering the blow causing me to hit Mr. Schneider in the mouth. Mr. Schneider then struck me in the left thigh with his right fist.

Rudy began to pull Mr. Schneider toward the door of the shed. Mr. Schneider began to swing and kick wildly at me and my brother. The space was very confined and the fight was intense. I attempted another control strike to the brachial plexus origin, but missed and hit the suspect in the nose.

About the time that I hit the suspect in the nose, I observed Sergeant Hatcher drive stun Mr. Schneider. After two or three stuns Mr. Schneider surrendered. We pulled him from the shed and handcuffed him. After that no other force was used against Mr. Schneider.

I notified my immediate supervisor, Sergeant Tunches, about the incident, completed a supplement to the burglary offense report, and I forwarded a use-of-force report to the on-scene supervisor, Sergeant Hatcher.

I was not involved in the transport, but I know from personal knowledge that an ambulance was dispatched to the scene to treat Mr. Schneider for his injuries.

Based upon my experience, training, and the particular circumstances of this incident, I believe that the force that I used was reasonable. Mr. Schneider had not been searched and was a potential deadly threat. He had access to a detached lawn mower blade and other garden tools that by their manner of use could become deadly weapons. He was crazed, apparently suicidal, and probably homicidal. The force that I used did not bring him under control.

> Mr. Schneider violently resisted arrest until the moment that Sergeant Hatcher drive stunned him with the Taser.
>
> During the struggle I attempted to use disabling strikes to the collar bone and to the brachial plexus origin as I have been trained. However, in a violent fight the strikes do not always hit their intended target as easily as during practice in the training academy. Under these specific circumstances I believe the other peace officers would agree that the force I used was reasonable.

(Docket Entry No. 17, Exhibit 4.)

In his affidavit, Sergeant Mitchell Hatcher testified, in relevant part, as follows:

> On August 23, 2005, I was a Harris County Sheriff's Sergeant, assigned to the Patrol Division. At about 2:45 p.m. I responded to an evading arrest call originating from 14707 Honey Comb Lane. When I arrived at the intersection of Jarvis and Mystic Bend, dispatch advised of a burglary in progress call at 13602 Jarvis. Deputy Guerrero told dispatch that he was in front of the house. I advised dispatch that I would be out with Deputy Guerrero at the burglary in-progress call.
>
> I saw several patrol cars in front of the residence at 13602 Jarvis. Deputy M. Thomas, K-9 Unit 40K1, along with Houston Police Officer D. Thomas, K-9 Unit 73K32, and his partner Rudy were approaching the scene actively tracking the original suspect from the evading arrest call.
>
> I climbed the fence and opened the electric gate to let the K-9 Units into the yard. Rudy tracked the suspect to a small out-building in the back yard. Rudy alerted to the presence of the suspect in the out-building. I was approaching from behind when the officers opened the door. I heard them order the suspect to 'Get down!' to lie on the ground, and to show his hands. The suspect was obviously refusing to comply because they repeated the orders several times.
>
> As I got closer I saw the suspect jump down from the attic area of the out-building and stand facing the two officers. The inside of the out-building was small. Several gardening tools were within reach of the suspect, which he could easily use as weapons of opportunity. The suspect could potentially use the tools as deadly weapons by his manner of use. The suspect continued to defy the officer's orders.

7

Officer D. Thomas ordered the suspect to lie on the ground and that if he did not comply he would send the dog in. The suspect stood there, shouting 'Shoot me!' Officer Thomas again warned the suspect to get down or he would send the dog in. The suspect shouted, 'Shoot me!' Officer Thomas released Rudy. It was not safe for the officers to enter to try to arrest this non-compliant, unsearched, crazed, felony suspect in such a confined area.

Rudy bit the suspect on the right thigh. The suspect reached down, grabbed Rudy by the neck, and began choking him. He also began beating Rudy with his fists. Officer D. Thomas went into the building to attempt to rescue his partner by pulling on his leash. At the same time, Deputy M. Thomas entered to help. Deputy Thomas carried a small 'Stinger' flashlight that he had been using to look into the dark out-building. He delivered several control strikes to the suspect's collarbone area with no result. Just then Rudy pulled and the suspect began to lurch forward as Deputy Thomas was in the process of swinging toward the suspect's shoulder-collarbone area. The strike missed and struck the suspect in the mouth hard enough to dislodge teeth. The strike to the suspect's mouth did not stop his attack. By this time the suspect was at the doorway and Rudy released him. The suspect continued to fight by punching and kicking Deputy Thomas. Deputy Thomas attempted a brachial stun with his flashlight, but due to the suspect's violent struggle the blow struck the suspect in the nose.

Officer Thomas pulled Rudy out of the way so that I could get in to help Deputy Thomas, who was still violently struggling with the suspect. I deployed my Taser in 'drive stun mode' to the suspect's abdomen, side, and back. As I was deploying my Taser I continually ordered the suspect to stop resisting and place his hands behind his back. The suspect finally complied and was placed in handcuffs. No one used force against the suspect after he was in handcuffs.

The suspect was searched for weapons and treated by Emergency Medical Personnel at the scene. We identified the suspect as Guy Jerome Schneider, who is the plaintiff in this lawsuit.

In my opinion, the amount of force used to arrest Mr. Schneider was reasonable under the circumstances. No officer or deputy used more force than necessary to take Mr. Schneider into custody. I am convinced that Deputy Thomas' strikes to Mr. Schneider's mouth and nose were unintended consequences of a violent struggle. Neither strike slowed Mr. Schneider. If

8

>not for the Taser. I am sure that we would have needed to call for the assistance of several other deputies near the scene to get Mr. Schneider under control. It was in everyone's best interest to end the fight as quickly as possible. I know now, from supplements to the incident report that Mr. Schneider was under the influence of cocaine and benzodiazepines during the struggle. I know that he was not fazed by any use of force before I deployed the Taser.

*Id.*, Exhibit 7.

In an attempt to raise a disputed fact question on his use of excessive force claim, plaintiff argues that the use of force was unreasonable because, "Confronted by numerous sheriff deputies plaintiff surrendered by putting his hands in the air," and cites as support pages 1 and 2 of the Detail Report for Harris County Law Enforcement (Docket Entry No. 25, p. 10; Exhibit 4.) The report, however, refutes plaintiff's argument, as it states that plaintiff threw his hands in the air when he saw his acquaintance, Richard Dunlap, the owner of the burglarized home. When plaintiff later saw the law enforcement officers, he fled. This event is summarized in the report as follows:

>Upon arrival, [Deputy Loftin] met with [the homeowner] Dunlap. He stated a white male who he knew as Guy Schneider had broken into his residence. [Dunlap] stated when he arrived home for the alarm call, he observed Mr. Schneider leaving his front yard area when he pulled into the driveway. He stated Mr. Schneider threw his hands up in the air and stated 'I MESSED UP.'
>
>\* \* \* \*
>
>[Deputy Loftin] followed Mr. Dunlap to 14706 MYSTIC BEND where he stated Mr. Schneider's parents lived. While approaching the front of the residence, [Deputy Loftin] heard a loud noise on the EAST side of the residence. [Deputy Loftin] and Deputy Baker went to [that] side of the residence and observed the suspect walking through the gate toward [the deputies]. [Deputy Loftin] ordered the suspect to stop. He looked at [the

9

> deputies] and stated 'FUCK THIS' and started running through the back yard. [Deputy Loftin] chased the suspect over the cyclone fence and over the ditch into the field. [He] advised dispatch the suspect was evading and needed other Patrol Units to set up a perimeter.

*Id.*, pp. 4-5. Thus, the report provides plaintiff no probative summary judgment evidence that he had surrendered to the officers prior to his being subdued in the storage shed.

Plaintiff further asserts that, because he was unarmed, "severely wounded" by the ankle cut he sustained during the burglary itself, and weighed only 158 pounds at the time, the officer's use of force was "obviously" applied not in good faith but "for the purpose of causing malicious and sadistical (sic) harm." (Docket Entry No. 25, pp. 10, 27.) He further claims that his "loss of undetermined large quantities of blood 'just might' explain the plaintiff's clouded judgment and or crazed suicidal state" and his "apparent memory loss." *Id.*, p. 11. None of these conclusory allegations[2] are supported with probative summary judgment evidence, and they are insufficient to raise a genuine issue of material fact precluding summary judgment. Nor is plaintiff correct in arguing that the report shows he was outside of the shed on the ground when attacked by the dog and the officers; the report shows that plaintiff was on the ground of the storage shed. Docket Entry No. 25, Exhibit 4, p. 9. Although plaintiff states that, after his was bitten by the dog, he fell to the ground "in a surrendering state," he stops well-short of presenting probative summary judgment

---

[2] That plaintiff weighed 158 pounds appears undisputed, but is immaterial to the excessive force issue in this case. Further, the fact that plaintiff was found to be unarmed when arrested does not control the issue of whether the officers, under the totality of the circumstances, acted in good faith in using force to arrest plaintiff. There is no evidence in the record establishing that, prior to plaintiff's arrest, the officers knew he was unarmed.

evidence that he actually surrendered to the arresting officers. *Id.*, p. 14. Plaintiff's allegation that he "complied with Deputies orders" is supported with probative summary judgment evidence only to the limited extent that he obeyed the officers' order to come down from the attic; he ignored their additional orders to surrender and exit the building. *Id.*; Exhibit 6. Nor does plaintiff accurately cite defendant's summary judgment evidence; neither the affiants nor the report state that "an unknown Taser was deployed to bring the plaintiff back to a conscious state," or that he was "unconsciously handcuffed on the ground by the bushes" when struck by the Taser. *Id.*

The issue is whether the officers' use of force was objectively reasonable at the time the force occurred. *See Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001), citing *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985). The issue of reasonable objectiveness is one for the courts to decide as a matter of law. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). The clear and uncontroverted probative summary judgment evidence in the instant case shows that plaintiff, who tested positive for cocaine and benzodiazepines immediately following his arrest, burglarized a residence and fled from police officers who attempted to apprehend him. The officers found him hiding in a nearby tool shed, and ordered him to exit and surrender. Plaintiff ignored the orders, and instead told the officers to shoot him. The officers described him as being in a "crazed suicidal state," did not know whether he was armed, and saw potential dangerous weapons within his reach. When a police dog was released to help apprehend plaintiff, the dog bit plaintiff in the

11

leg and attempted to move him toward the door. Plaintiff then struck and choked the dog. The officers tried to pull the dog away, but plaintiff began attacking them. The officers' attempts to deploy strategic strikes against plaintiff failed when plaintiff moved, causing instead the strikes to hit plaintiff in the mouth and nose. Plaintiff was finally subdued and handcuffed when a third officer stunned him with a Taser. He was arrested and transported to a local hospital.

Plaintiff presents no probative summary judgment evidence raising a genuine issue of material fact as to whether the officers used excessive force under these facts. Defendant is entitled to summary judgment dismissing plaintiff's claim for use of excessive force.

*Municipal Liability for Use of Excessive Force*

Harris County, as a local governmental entity, is liable to plaintiff in this instance only if Sheriff Tommy Thomas promulgated or adopted a policy that was the "moving force" that caused one or more of his employees to violate plaintiff's constitutional rights. *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978).

To invoke municipal liability under *Monell*, a plaintiff must first establish that an employee of the local governmental entity violated his constitutional rights. In absence of a constitutional violation, the question of municipal liability is moot. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Municipal liability under a section 1983 claim requires proof of (1) a policy maker; (2) an official policy; and (3) a violation of a constitutional right whose moving force is the

policy or custom. In the instant case, Harris County can only be liable to plaintiff is there is either an unconstitutional action by an official policy maker or a policy or custom that caused the deprivation of his constitutional right. *See Monell* at 694; *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).

In arguing that Harris County is liable for his injuries, plaintiff alleges, without factual application, that Sheriff Tommy Thomas's use-of force policy "inflicted the injuries," and that "Harris County Sheriff's Office departmental manual excerpts, chapter III, law enforcement operations policies, § 1.0, Use of Force, page 2-10, are Harris Count[y's] policies, the moving force behind the deputies (employees) use of unreasonable and unconstitutional force." (Docket Entry No. 25, p. 18.) These conclusory statements are not probative summary judgment evidence and are insufficient to raise a genuine issue of material fact precluding summary judgment.

Plaintiff has neither pleaded nor proved a non-conclusory, causal connection between the use-of-force policy and his injuries. Plaintiff improperly attempts to raise vicarious liability of defendant based on the acts of its employees, rather than the policy liability required under *Monell*. Thus, plaintiff fails to establish his claim for municipal liability, and defendant is entitled to summary judgment dismissing plaintiff's claims.

*Individual Defendants*

The Court denied plaintiff's motion to amend to name Officer W.M. Thomas, Sergeant M. Hatcher, and Officer D.A. Thomas in their individual capacities. (Docket Entry

No. 62). Even assuming these individuals were named as defendants, plaintiff raises no viable section 1983 claim against them. To the extent that he asserts claim of individual liability, qualified immunity would apply. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). Claims of qualified immunity require a two-step analysis. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. If there is a constitutional violation alleged, the court must ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id*. at 623-24. The only issue in the qualified immunity analysis is whether there are disputed facts material to determining if these officers' use of force was objectively reasonable under the clearly established law at the time of the incident.

The Court has already determined that, based upon the probative summary judgment evidence appearing in the record, these three individuals did not violate plaintiff's Fourth Amendment rights by using excessive force during his arrest. Accordingly, even assuming these individuals were defendants before this Court, they would be entitled to summary judgment dismissal of plaintiff's claims against them.

*Claims for Deliberate Indifference to Serious Medical Needs*

Plaintiff next claims that, although he was provided emergency medical care for his bodily injuries, he was not given timely dental care for the dislodged and broken teeth. He admits that he received pain medication in jail, but states that he was "forced to make court

14

appointments with broken teeth protruding from his gums." (Docket Entry No. 25, p. 15.) He alleges that the broken teeth were extracted a week after his arrest. He states that this constituted deliberate indifference to his serious dental needs as a pretrial detainee in jail.

A pretrial detainee's claims for denial of medical care are governed by the Fourteenth Amendment. *Hare v. City of Corinth*, 74 F.3d 633, 647-48 (5th Cir. 1996). Plaintiff's pleadings raise an "episodic act or omission" claim under the Fourteenth Amendment. To prevail, plaintiff must establish that jail officials acted with subjective deliberate indifference to his serious medical needs. *See Flores v. County of Hardeman, Texas*, 124 F.3d 736, 738 (5th Cir. 1997). To succeed in holding defendant accountable for such a violation, plaintiff must establish that the violation resulted from a policy or custom adopted or maintained by defendant with objective deliberate indifference. *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).

To establish the requisite deliberate indifference, plaintiff must show that jail officials had subjective knowledge of a substantial risk to his health, and that they responded with deliberate indifference to that risk. *See Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000). That is, plaintiff must present evidence that jail officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for his serious medical needs. *See Domino*, 239 F.3d at 756. Deliberate indifference is not the equivalent of negligence; deliberate indifference "describes a state of mind more blameworthy than negligence."

*Farmer v. Brennan*, 511 U.S. 825, 835 (1994). It is not sufficient that jail officials should have known of a substantial risk; they must have actual knowledge of the risk and ignore it. In sum, plaintiff must prove that jail officials knew of and disregarded an excessive risk of injury to him, and that they were both aware of the facts from which the inference could be drawn that a substantial risk of serious harm existed, and that they drew that inference. *Id*. at 837.

For those reasons, evidence of unsuccessful medical treatment, negligence, neglect, or even malpractice is insufficient to demonstrate deliberate indifference. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *see also Stewart v. Murphy,* 174 F.3d 530, 534 (5th Cir. 1999) ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."); *Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993) ("It is firmly established that negligent or mistaken medical treatment or judgment does not implicate the eighth amendment and does not provide the basis for a civil rights action.").

> In his affidavit, Troy M. Mannino, D.D.S., testified as follows:
>
> I am currently employed by the Harris County Sheriff's Office as a Dentist. I am a dentist currently licensed in the State of Texas. In my job capacity, I often review records of the Harris County Sheriff's Office which pertain to dental care received by inmates.
>
> By training and expertise, I am qualified as an expert in the field of dentistry and my expertise includes knowledge of the duties and appropriate decision-making process of dentists in Harris County, Texas.

I have reviewed the medical records of Guy Schneider while he was at the Harris County Jail.

Mr. Schneider was originally seen in the medical clinic on August 24, 2005, and was referred to the Dental Clinic at that time. Referrals from medical doctors are normally seen in the Dental Clinic the next day unless the presentation states that the patient's only problem is tooth decay. In those circumstances, an appointment is scheduled within one week. On August 25, 2005, and August 26, 2005, Mr. Schneider was in court and was not available for his Dental Clinic Appointment, He was again in court on Monday, August 29, 2005, and was not available for his Dental Clinic appointment. He was called again to the Dental Clinic on August 30, 2005, but did not keep the appointment.

Mr. Schneider was first seen in our Dental Clinic on August 31, 2005. He claimed that his teeth were fractured when he was arrested. A peri-apical radiograph was taken. There was no evidence of root fracture. Contrary to Mr. Schneider's statement, the examination and radiograph do not support the claim that his '. . . partial teeth were still hanging. . .' There was obvious evidence of a loss of the clinical crowns of the affected teeth including (all uppers) the right and left central incisors, the left lateral incisor and the left cuspid. The radiograph shows the fracture lines of the teeth to approximate or even to be apical to the crest of the alveolar bone.

\*   \*   \*   \*

Mr. Schneider did elect to have his teeth extracted. The four fractured teeth were extracted using local anesthesia. Some facial alveolar bone was removed due to the fracturing of the alveolus. The site was closed with six sutures. Mr. Schneider was placed on amoxicillin for five days and ibuprofen for ten days. In addition, the seven sutures previously placed at the [hospital] were removed from the nose. Mr. Schneider was scheduled for a follow-up appointment and was seen on September 12, 2005, for removal of the dental sutures. He was healing well.

Based on my review of Mr. Schneider's medical records, he was evaluated on several occasions by the dental staff at the Harris County jail. Based on those individual evaluations, appropriate tests were performed, appropriate medications were prescribed, and appropriate treatment given to him. I do not believe that the period of time between referral and treatment was clinically significant in his dental care. In my opinion, there is nothing in the medical

> records to indicate that Mr. Schneider failed to receive any necessary dental care in the jail for any dental condition of which he complained.
>
> In my opinion, Mr. Schneider was not denied reasonable dental treatment for the dental problems he was having. Based on the documentation in the medical records, the dental care providers at the Harris County Sheriff's Office were not deliberately indifferent to Mr. Schneider's medical problems and he received appropriate and adequate dental care at all times in the jail.

(Docket Entry No. 17, Exhibit 8.)

Plaintiff argues that he was entitled to emergency dental treatment prior to being booked into jail, and that the delay in receiving dental treatment constituted deliberate indifference to his serious medical needs. Plaintiff has not submitted probative evidence raising a genuine issue of material fact as to whether his dental injury constituted a medical emergency independent of his examination and treatment at the hospital emergency room. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Further, the probative summary judgment evidence shows that Harris County officers provided plaintiff dental care and treatment following his arrest. The jail physicians referred him to the dental clinic on August 24, 2005. On August 25th and 26th, plaintiff was in court and unavailable for a dental examination. Plaintiff again was in court the next business day, August 29, 2005, and unavailable. Plaintiff does not state why he missed his dental appointment scheduled for August 30, 2005, but he was examined and his teeth x-rayed in the dental clinic on August 31, 2005. Plaintiff elected to have the broken teeth extracted, and the teeth were removed shortly thereafter. According to his jail medical records, he was prescribed Vicodin for pain

associated with his other injuries and had been taking the narcotic pain medication throughout this episode.

Plaintiff's complaint that the delay in receiving dental care caused him "a life-long handicap and permanent loss" is unfounded in the record. (Docket Entry No. 25, p. 12.) His dental loss was caused not by any delay in treatment, but by the original injury itself, which occurred during his arrest. Plaintiff presents no probative summary judgment evidence that, had he been examined by a dentist sooner than August 31, 2005, his broken teeth would not have been extracted.

To succeed in holding defendant Harris County accountable for any violation of his Fourteenth Amendment rights regarding medical care, plaintiff must establish that the violation resulted from a policy or custom adopted or maintained by Sheriff Tommy Thomas with objective deliberate indifference. *See Flores v. County of Hardeman, Texas*, 124 F.3d 736, 738 (5th Cir. 1997). Because plaintiff fails to met his burden of showing that a jail official acted with subjective deliberate indifference to his Fourteenth Amendment rights, consideration of defendant's governmental agency liability need not be reached. *See Flores*, 124 F.3d at 739. Accordingly, defendant is entitled to summary judgment dismissing plaintiff's claim.

*State Law Claims*

Plaintiff also claims that defendant was negligent and violated state law as to the non-existent or inferior medical care he claims to have received at the jail. Under 28 U.S.C. §

1367(c)(3), a federal court may decline to exercise supplemental jurisdiction over state law claims where the district court has dismissed all claims over which it has original jurisdiction. Because plaintiff's federal claims are dismissed, this Court declines to exercise jurisdiction over any state law negligence or other state law claims he has asserted. Plaintiff's state law claims will be dismissed without prejudice.

*Conclusion*

For these reasons, the Court GRANTS defendant's motion for summary judgment (Docket Entry No. 17), DENIES plaintiff's motion for summary judgment (Docket Entry No. 25), and DISMISSES plaintiff's federal constitutional claims with prejudice. Plaintiff's state law claims are DISMISSED without prejudice. Any and all pending motions are DENIED AS MOOT.

The Clerk will provide copies to the parties.

Signed at Houston, Texas on February 9, 2009.

_____
Gray H. Miller
United States District Judge